**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO: 1:16-CV-21238-JLK**

JOSHUA WASSER, ILA GOLD, and
ALYSSA RECHTMAN, on behalf of
themselves and all others similarly situated,

      *Plaintiffs*,

v.

ALL MARKET INC.,

      *Defendant*.

_____

**DEFENDANT'S MOTION TO DISMISS COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

Defendant All Market Inc., d/b/a Vita Coco, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Local Rule 7.1, moves to dismiss Joshua Wasser, Ila Gold, and Alyssa Rechtman's ("Plaintiffs") Complaint with prejudice.

## INTRODUCTION

Coconut water is a clear liquid found at the heart of coconuts.  Complaint ¶ 7, (ECF No. 1) ("Compl.").  With its sweet taste, naturally occurring electrolytes, and low fat content, people in tropical countries around the world have long prized coconut water as a refreshing beverage, often drunk straight from the coconut.  *See id.* ¶¶ 7-9.  But until Vita Coco's launch twelve years ago, coconut water was virtually unknown in the United States.  *See id.* ¶¶ 10, 21.  Inspired by a visit to Brazil, Vita Coco's founders envisioned bringing this iconically tropical drink to the United States.  *See id.* ¶¶ 33-34.  And they succeeded.  Within a few years, Vita Coco pioneered a new, wildly popular beverage category.  *See id.* ¶¶ 10-12, 21, 33.  As Plaintiffs themselves recognize, Brazil remains a vital part of Vita Coco's identity, history, and current business. *See e.g. id.* ¶¶ 23, 33-40.  To this day, Brazil produces a substantial volume of Vita Coco's production for U.S. distribution. *See id.* ¶¶ 11, 23.

Plaintiffs acknowledge that, as Vita Coco's production expanded beyond Brazil, its labels evolved to downplay Brazil.  Compl. ¶¶ 16, 29; *compare id.* Ex. A *with id.* Ex. B.  In fact, Plaintiffs even admit that each unit sold specifically identifies its production location on the adjoining nutrition facts panel, a fact readily apparent from their own exhibits.  *Id.* ¶ 30; Ex. B at 2, 9.  Nevertheless, Plaintiffs claim that Vita Coco's labels and marketing duped them into believing that the coconut water is exclusively "sourced and manufactured with Brazilian coconuts and imported from Brazil."  *Id.* ¶ 47.  Quite apart from the factual inaccuracies underlying these claims (many of which are contradicted by the very documents and sources Plaintiffs cite in their Complaint), a flawed legal premise animates these claims: that Vita Coco

1

should have abandoned its Brazilian beginnings entirely when the Company expanded coconut water production into other countries, and that now, any time Vita Coco even **mentions** Brazil it has somehow committed an act of consumer fraud.  That is not the law.

Plaintiffs have failed to state a claim.  As a threshold matter, the Complaint is devoid of facts demonstrating that Plaintiffs were even injured at all, for Plaintiffs do not actually state that they bought Vita Coco sourced from outside Brazil.  Also, because Plaintiffs now know the "truth" (that Vita Coco sources its coconut water from additional tropical countries)—and, indeed, acknowledge that they can determine whether any unit of Vita Coco was produced in Brazil simply by reading the existing label—they cannot demonstrate any potential future injury that would supply standing for injunctive relief.  Nor have they identified a single actionable misrepresentation, much less **which** statements caused them injury.  Plaintiffs' allegations likewise foreclose any theory that Vita Coco is "worthless," and, as a result, the Court should dismiss their claim for a full refund.

## BACKGROUND

### I.  Vita Coco's Coconut Water

Vita Coco is a true American success story.  Two childhood friends, New Yorkers Michael Kirban and Ira Liran, visited Brazil and witnessed first-hand the Brazilian enthusiasm for coconut water.  *See* Compl. ¶ 33.  As described on Vita Coco's website, when Brazil inspired Kirban and Liran to bring coconut water to the U.S. market, "Vita Coco was born."  *Id.*  Barely twelve years later, the coconut water category has exploded in popularity in the U.S. and abroad—largely because of these two innovators.  *Id.* ¶¶ 11-12, 21.

Initially, Vita Coco sourced all its coconut water from Brazil.  Compl. ¶ 14.  To this day, Vita Coco sources huge volumes of Brazilian coconut water for U.S. distribution.  *Cf.* Compl. ¶¶

11, 23.[1]  Eventually, though, sky-high demand outpaced supply, and the Company responded by expanding production to other tropical countries, eventually partnering with farmers and factories in the Philippines, Malaysia, Thailand, Indonesia, and Sri Lanka.  *See id.* ¶ 22.  Vita Coco did not keep these developments quiet; on the contrary, the Company—while continuing to celebrate its Brazilian roots—has always been transparent about (and even promoted) the sources of its coconut water.  In a 2012 interview with a widely distributed magazine, for example, Kirban explained at the outset how Vita Coco was "producing coconut water in a dozen facilities, in South America and Southeast Asia."[2]  *See also infra* pp. 14-15 (discussing Vita Coco website).

Vita Coco's product labels also changed over time.  On the early rectangular packages, the products read "Made in Brazil" on the front panel, and then read "Imported from Brazil" on the ***front*** side-angled display panel of the subsequent eight sided containers known as "Tetra Paks."  Compl. ¶ 16, Ex. A.  Around the time that production expanded beyond Brazil, however,

---

[1]     The Complaint incorrectly alleges that "[a]ll Large and Small size Vita Coco are manufactured and sourced outside Brazil" other than certain small size containers sold in 4-packs. Compl. ¶ 23. *Compare* Declaration of Jonathan Burth in Support of Request For Judicial Notice (the "Burth Decl.") (filed concurrently)) Ex. 1-12 (demonstrating variety of sizes and flavors produced in Brazil).  As other courts in this District have recognized, a court ruling on a motion to dismiss may take judicial notice of allegedly deceptive or misleading product labels upon which a plaintiff's allegations are based.  *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1371 n.1 (S.D. Fla. 2015); Order Granting Def.'s Mot. for Judicial Notice, *Marty v. Anheuser-Busch Cos., LLC*, No. 1:13-cv-23656-JJO, ECF No. 38 (S.D. Fla. Jan. 21, 2014); *Merl v. Warner Bros. Entm't Inc.*, No. 1:12–cv–20870–PAS, 2013 WL 266049, at *1 n.5 (S.D. Fla. Jan. 23, 2013).  *See* Def.'s Req. for Judicial Notice ("RJN") at 5-7 (filed concurrently).

[2]     Reshma Yaqub, *Vita Coco's CEO Has Something to Prove*, Inc. Magazine (July/August 2012) *available at* http://www.inc.com/magazine/201207/reshma-yaqub/the-way-i-work-michael-kirban-vita-coco.html (first paragraph of article). *See* RJN at 8-9, Ex. C.  In ruling on a motion to dismiss, "courts may take judicial notice of documents such as   . . . newspaper articles . . . for the limited purpose of determining which statements the documents contain."  *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015).  Vita Coco requests that the Court take judicial notice only of the fact that this article and the statements therein was published, which can be readily verified by visiting the publication's webpage and cannot, therefore, be reasonably disputed.  See Fed. R. Evid. 201(b)(2).

Vita Coco exchanged "Imported from Brazil" for "Born in Brazil," an homage to its roots, and—contrary to Plaintiffs' allegations—later moved the slogan to one of the Tetra Pak's **back** side-angled panels.[3]  *See* Compl. ¶ 29; Ex. B.  While the front and back panels are similar, the spout is positioned closest to the front panel of the product, where it is naturally positioned for a consumer to drink (a consumer reversing that position may be in for a spill).  Compl. Ex. B at 7-8 (showing differing location of front and back panels based on spout location, and that phrase "Born in Brazil" is on back panel to the left of the Nutrition Facts Panel); *id.* at 1-5 (images of the rear panel); *see* Compl. ¶¶ 2, 29 (incorrectly alleging that the slogan is on the front).  *See Century Land Development, L.P. v. FFL Development, L.L.C.*, 2008 WL 1850753 (S.D. Fla. Apr. 24, 2008) (dismissing complaint where exhibit contradicted complaint's allegations).

On Vita Coco's current packaging, the phrase "Born in Brazil" appears barely more than an inch (and, on 330-milliliter units, even *less* than an inch) away from the statement identifying the country of production (e.g., "Produced in Brazil," "Produced in Sri Lanka") on the adjoining back panel.  *See, e.g.*, Compl. ¶ 30, Ex. B at 9; Burth Decl. Ex. 1-18.  The font for the country of production, moreover, is a bold typeface, one that is nearly the same size as that used for the words "Born in Brazil" and is set off from the other text by a dividing line (except when the unit is produced in Brazil, and includes additional source information). *E.g.*, *compare id.* Ex. B at 2 (Produced in Thailand) *with* Ex. B at 9 (Produced in Brazil).  Set against a matte, contrasting background, the country of production is legible to a consumer looking at the "Born in Brazil"

---

[3] Vita Coco is happy to supply demonstrative examples of the products for the Court's inspection in connection with this Motion.  *See, e.g.*, *Marty v. Anheuser-Busch Cos., LLC*, 43 F. Supp. 3d 1333, 1340 (S.D. Fla. 2014) (O'Sullivan, M.J.) (inspecting demonstrative examples of beer alleged to be deceptively labeled as originating from Germany); *Dumas v. Diageo PLC*, No. 15cv1681, 2016 WL 1367511, at *3 (S.D. Cal. Apr. 6, 2016) (inspecting examples of beer alleged to be deceptively labeled as originating from Jamaica).

4

phrase on the back side-angled panel of the Vita Coco container from any reasonably direct angle.  *E.g.*, Compl. Ex. B at 2.

## II.      The Complaint

Plaintiffs allege that they are consumers of Vita Coco from Florida (Wasser), New York (Gold), and California (Rechtman).  They allege that the statements on Vita Coco's container and Vita Coco's marketing misled them into believing that "all Vita Coco is sourced and manufactured with Brazilian coconuts."  Compl.  ¶¶ 44, 47, 50.  Plaintiffs do not allege that they *ever* purchased a container of Vita Coco that was sourced from outside Brazil; they only allege that they have "since learned that not all Vita Coco is sourced and manufactured with Brazilian coconuts."  *Id.*   Based on these allegations, Plaintiffs assert claims for violations of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), New York's General Business Law § 349, California's Unfair Competition Law § 17200 (UCL), California's Consumer Legal Remedies Act § 1750 (CLRA), and common law unjust enrichment and injunctive relief.  They seek five classes: four state subclasses, and two national classes based on the common law claims.

## ARGUMENT

## I.   Legal Standards

Defendants may challenge claims through a motion to dismiss when the Court lacks subject matter jurisdiction or when the plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(1), 12(b)(6).  Dismissal under Rule 12(b)(1) is appropriate where the complaint does not establish jurisdictional standing under Article III of the U.S. Constitution. Article III confers federal jurisdiction only when there is an actual case or controversy, which requires that the plaintiff allege: (1) "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) injury that is fairly traceable to the challenged conduct of the defendant; and (3) injury that will be redressed by a favorable decision.  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Where Plaintiffs cannot demonstrate injury in fact, the Court must dismiss their claims.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss" under Rule 12(b)(6).  *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1372 (S.D. Fla. 2015) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. at 678, 679 (2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive dismissal.  *Ashcroft*, 556 U.S. at 678; *see also Oxford Asset Mgmt., LTD v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).  Unless Plaintiffs have pled specific and concrete facts that, if true, would "nudge[] the[] claims across the line from conceivable to plausible," the Court must grant this motion.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Moreover, Plaintiffs must meet Rule 9(b)'s stringent pleading standards for their California and Florida causes of action.  *See, e.g.*, *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1294 (S.D. Fla. 2007) (dismissing FDUTPA misrepresentation claim and four other claims for "fail[ure] to satisfy the mandates of Rule 9(b)"); *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368 (S.D. Fla 2015) (applying heightened pleading standard to FDUTPA claims where complaint alleges that defendants caused damages "through deception" (emphasis omitted)); *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. and Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1323 n.8 (S.D. Fla. 2013) (observing that "most courts have found that Rule 9(b) applies to claims brought under states' consumer fraud statutes.");[4] *see also Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 295 F.R.D. 540, 545 (S.D.

---

[4]     Vita Coco recognizes that other courts in this District disagree that Rule 9(b) applies to FDUTPA claims.  *See, e.g.*, *Guerrero v. Target Corp.*, 889 F. Supp. 2d 1348, 1355 n.5 (S.D. Fla. 2012) (acknowledging split); *Gastaldi v. Sunvest Communities*, 637 F. Supp. 2d 1045, 1058 (S.D. Fla. 2009) (declining to apply Rule 9(b) to FDUTPA claim).  Vita Coco submits that this Court correctly applied Rule 9(b) to dismiss a FDUTPA claim in *Garcia* and should do so here.

Fla. 2013) (unjust enrichment based on misrepresentations); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (UCL and CLRA).   Accordingly, Plaintiffs must spell out the "who, what, when, where, and how" of Vita Coco's alleged deceptive conduct.   *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotation omitted).   They have not done so.

## II.     Plaintiffs Lack Article III Standing.

### A.     Plaintiffs Have Failed To Allege That They Purchased A Mislabeled Product.

Plaintiffs cannot satisfy Article III's injury in fact requirement because they have not alleged an injury.   Under Florida, New York, and California law, plaintiffs have standing to sue over allegedly mislabeled products only if they actually purchased that product.   *See Dapeer*, 95 F. Supp. 3d at 1373; *In re Takata Airbag Product Liability Litigation,* MDL No. 2599, 2016 WL 1266609, at *3 (S.D. Fla. Mar. 11, 2016); *Toback v. GNC Holdings, Inc.*, No. 13–80526–CIV, 2013 WL 5206103, at *5 (S.D. Fla. Sept. 13, 2013); *Birdsong v. Apple, Inc*., 590 F.3d 955, 960 (9th Cir. 2009); *Meyer v. Sprint Spectrum*, *L.P.*, 45 Cal. 4th 634, 638 (Cal. 2009).   At most, Plaintiffs speculate that they *may* have purchased a non-Brazilian product and suffered some injury as a result.

Plaintiffs only allege that after drinking (and presumably enjoying) Vita Coco's coconut water "consistently," they learned that "not all" of Vita Coco is sourced from Brazil.   Compl. ¶¶ 44, 47, 50.   But Plaintiffs also recognize—as they must—that Vita Coco continues to source a substantial volume of coconut water from Brazil.   *Id.* ¶ 23.   Nor have Plaintiffs alleged on behalf of themselves or the class—because as a factual matter, they cannot—that *only* non-Brazilian coconut water was available for purchase in their home states of Florida, California and New York.   The logical corollary, then, is that *Plaintiffs themselves* cannot say whether they are members of the proposed class, as each Plaintiff could have easily been drinking *Brazilian-sourced* coconut water "at all relevant times."   As a result, the Complaint raises only a mere

suspicion that Plaintiffs *might* have purchased a purportedly mislabeled container of Vita Coco. That is too speculative to satisfy Article III.

### B. Because They Know The "Truth," Prospective Injunctive Relief Would Not Redress Plaintiffs' Alleged Injury.

Plaintiffs lack Article III standing to seek *prospective* injunctive relief.[5]  Even though Plaintiffs allege that they would purchase Vita Coco coconut water again "if properly labeled" (Compl.  ¶¶ 46, 49, 52), they are not "realistically threatened by a repetition of the violation." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (citation omitted).  This is because there is no way that "prospective relief will redress [their] injury."  *See Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 951 (S.D. Cal. 2007).  Plaintiffs are now "fully aware" of the 'truth' about Vita Coco—namely, that the coconut water they have purchased "consistently" is produced from both Brazilian and non-Brazilian sources.  Compl. ¶¶ 44, 47, 50.  Likewise, they now know that they can determine whether any particular unit is produced in Brazil simply by looking at the label.  Accordingly, there can no longer be a shred of misunderstanding to the contrary that might deceive Plaintiffs in the future.  *Cattie*, 504 F. Supp. 2d at 951 (no standing for injunctive relief where plaintiff was "now fully aware of the linens' thread count").

### III. Plaintiffs Have Not Identified Any Actionable Misrepresentations.

However styled, all of Plaintiffs' claims founder for a simple reason:  they have not identified a single actionable misrepresentation likely to deceive a reasonable consumer.  *See PNR, Inc. v. Beacon Prop. Mgmt. Inc.*, 842 So. 2d 773, 777 (Fla. 2003); *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (1st Dist. 2003); *Stutman v. Chemical Bank*, 95 N.Y. 2d 24, 28 (2000); *cf. Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1100 (Fla. 3d DCA 2014).  "Likely to deceive" demands "more than a mere possibility that the advertisement might

---

[5] For this reason, Plaintiff Rechtman's CLRA claim must be dismissed in its entirety, as she seeks solely injunctive relief under that cause of action.  Compl. ¶ 127.

conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Lavie*, 105 Cal. App. 4th at 508.  Instead, "likely to deceive" means "that the ad is such that it is **probable** that a **significant** portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."  *Id.* (emphasis added).

While the question of whether a statement is false or misleading is ordinarily a question of fact, courts have not hesitated to dismiss claims where they "can conclude as a matter of law that members of the public are not likely to be deceived by the product packaging."  *Dumas v. Diageo PLC*, No. 15cv1681, 2016 WL 1367511, at *3 (S.D. Cal. Apr. 6, 2016) (quotations omitted).  Just recently in *Dumas*, for example, a California district court dismissed a similar lawsuit over the labels of Red Stripe beer, concluding that phrases like "Taste of Jamaica" and "Jamaican Style Lager" would not deceive reasonable consumers into believing the beer is actually brewed in Jamaica.  *Id.*[6]

Here, Plaintiffs bore the burden of alleging a "specific and measurable claim" capable of being proved false or being reasonably interpreted as a statement of objective fact.  *Vitt v. Apple Comput., Inc.*, 469 F. App'x 605, 607 (9th Cir. 2012) (quotation omitted).  Instead, they point only to a "generalized, vague" statement that, in context, could not deceive a reasonable consumer—especially in light of the statement's placement relative to nearby information

---

[6] *See also Salters v. Beam Suntory*, No. 4:14cv659, 2015 WL 2124939, at *3 (N.D. Fla. May 1, 2015) (Hinkle, J.) (dismissing claims that "handmade" on labels of Maker's Mark bourbon because "no reasonable person would understand 'handmade' in this context to mean literally made by hand"); *Welk v. Beam Suntory Imp. Co.*, 124 F. Supp. 3d 1039, 1043-44 (S.D. Cal. 2015) (same for Jim Beam labels); *Keunzig v. Hormel Foods Corp.*, 505 F. App'x 937, 938 (11th Cir. 2013) (affirming dismissal of claims that certain fat-free and calorie claims on food labels were unfair or deceptive); *Lacoff v. Buena Vista Publ'g, Inc.*, 183 Misc. 2d 600, 610 (N.Y. Sup. 2000) (dismissing NY GBL § 349 claims of consumer fraud relating to investment book promising to "beat the stock market" and provide group's "secret recipe for investment success" because they were non-actionable).

supplying the particular unit's production location that is similarly sized and equally legible. *Welk*, 124 F. Supp. 3d at 1043 (quotation omitted).

   A.     **Vita Coco's Tetra Paks Would Not Mislead Reasonable Consumers.**

Without a doubt, the linchpin of the Complaint is the phrase "Born in Brazil," (*e.g.*, ¶¶ 2, 29-31, 45, 48, 51, 58, 69, 70, 76, 88, 92-94, 97, 104, 113, 116) which, as noted, appears on the **back** of Vita Coco's Tetra Paks. Both standing alone, and in context, it is simply not probable that consumers would reasonably rely on "Born in Brazil" to identify the country of origin, or that it could mislead a significant number of consumers, acting reasonably in the circumstances. *Lavie*, 105 Cal. App. 4th at 508.

*First*, the notion that a product manufactured from a harvested crop like coconut water can be "born" is nonsensical. No consumer could reasonably interpret "Born in Brazil" as a statement of objective fact, much less connect it to Plaintiffs' extreme and idiosyncratic conclusion that every bottle of Vita Coco is exclusively "sourced and manufactured with Brazilian coconuts," any more than a consumer could discern from the label of beer marked "The Taste of Jamaica" "what Jamaica 'tastes' like." *Dumas*, 2016 WL 1367511, at *4. Rather, the phrase "Born in Brazil" is a subjective reference to an abstract and romantic product attribute (namely, Vita Coco's Brazilian heritage) and is thus precisely the type of non-actionable statement that courts often refer to as "puffery" or "sales talk." *See, e.g.*, *Alvarez v. Royal Caribbean Cruises*, 905 F. Supp. 2d 1334, 1342 (S.D. Fla. 2012) (statements on company website describing cruises as "an experience you'll never forget" constituted non-actionable puffery); *Silver v. Countrywide Home Loans*, Inc., 760 F. Supp. 2d 1330, 1342-43 (S.D. Fla. 2011) (statements describing a loan as "a good deal" were unverifiable statements of opinion and therefore not actionable), *aff'd*, 483 F. App'x 568 (11th Cir. 2012). By contrast, in a case challenging the labeling of Beck's Beer, a court concluded that the combination of the phrase

"Originated in Germany" with "Brewed under the German Purity Law of 1516" and "German Quality" created a specific, measurable affirmative representation designating German origins and making "it sound like the production of the beer was subject to German law" that could be proved demonstrably true or false. *Dumas,* 2016 WL 1367511, at *5 (discussing *Marty*, 43 F. Supp. 3d at 1340-43). Unlike the objective statements in *Marty*, the phrase "Born in Brazil" is non-actionable puffery and thus cannot entitle Plaintiffs to any legal relief.

*Second*, just because a reference to "Brazil" appears on the packaging, the statement "is not sufficient to support a conclusion that consumers would be confused regarding the origin and ingredients of the [coconut water]." *Dumas*, 2016 WL 1367511, at *3. Here, "Brazil" always appears in close proximity—less than 1 inch away on 330-milliliter units, approximately 1 inch away on 500-milliliter units, and about 1¼ inches away on the 1-liter units —to a similarly-sized, clearly legible, and bold printed statement of the country of origin on each container of Vita Coco. Compl. Ex. B at 2, 9; Burth Decl. Ex. 1-18. As the *Dumas* court observed about Red Stripe (and disagreeing with the plaintiff's conclusory allegations that the disclaimer was difficult to read), "anyone examining the label carefully enough to read the language on the back of the label would see that the beer is brewed and bottled in Pennsylvania." *Dumas*, 2016 WL 1367511, at *5. So too here. *Compare id.* (finding significant that beer's actual brewing location was printed on "the edge of the label" and that "[a]lthough the words are small, the contrasting white print is legible") *with Marty*, 43 F. Supp. 3d at 1340 (concluding that "Product of USA" statement on beer can "is printed in white font against a shiny metallic silver background" and can be "obscured by overhead lighting."). Other courts have reached similar conclusions about products labeled "Havana Club" and "Cajun Boy," determining that such statements cannot mislead reasonable consumers who are also told the product's country of

origin.[7]   As in *Dumas*, the Vita Coco packaging uses bold, legible lettering set against a contrasting background to inform consumers where the coconut water in that unit was produced.

*Third*, Plaintiffs assert (as did the plaintiffs challenging Beck's Beer in *Marty*) that Vita Coco's outer cardboard packaging of its "4-packs" obscures the country of origin statement.  *See* Compl. ¶¶  2, 30.   However, Plaintiffs do not—because they cannot—plead that all, or even most, Vita Coco coconut water is sold in 4-packs (making the cardboard allegation irrelevant for all Tetra Paks sold as stand-alone units); they acknowledge that "some Small size Vita Coco sold in 'four packs' are manufactured and sourced from Brazil" (*id.* ¶ 23) (such that there could be no misrepresentation as to those products); and the images attached to their Complaint show two separate styles of cardboard cartons for 4-packs, one of which leaves the country of origin statement in full view (Compl. Ex. B at 8-9).

*Finally*, even assuming *arguendo* that the phrase "Born in Brazil" could be construed to signal that Brazilian coconuts are the exclusive source of Vita Coco's coconut water, there is nothing else on the Tetra Paks that does so.   While Plaintiffs allege that the color schemes of the Tetra Paks "mimic[] the Brazilian flag" (Compl. ¶ 2), the color schemes are palpably different. Vita Coco's dominant colors are sky blue and the azure of a shallow ocean, while the Brazilian flag's colors are dark blue, Kelly green, and yellow.   *Compare* Compl. Ex. B at 1-9 (images of Vita Coco) *with* RJN Ex. D (Brazilian flag).[8]   At most, the label's tableau presents a classic tropical beach scene, including palm trees, a peaceful ocean touching the sky, and, in the

---

[7] *Pernod Ricard USA LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 253 (3d Cir. 2011) (even if "Havana Club" on bottle of rum could be understood to signify the product's source as Havana Cuba, "those same words cannot mislead a reasonable consumer who is told in no uncertain terms that 'Havana Club' is a brand of rum made in Puerto Rico"); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 753 (5th Cir. 2006) ("Cajun Boy" and "Cajun Delight" trade names on imported seafood were not misleading because products were labeled with country of origin).

[8] Differences between the colors of Vita Coco's packaging and the Brazilian flag are even more visible in the flavored varieties of Vita Coco.  *See* Burth Decl. Ex. 2, 4-5, 7-8, 10-12.

foreground, a coconut with a straw sticking out of it.  Compl. Ex. B at 9; Burth Decl. Ex. 1-18.

Indeed, as Plaintiffs themselves allege, coconut water "has long been a popular drink in tropical

countries, often drank straight from the coconut."  Compl. ¶ 7.  That is precisely what Vita

Coco's labels convey.

**B.     Vita Coco Had No Heightened Duty to Inform Existing Customers of Its Expanded Production.**

While it is not entirely clear from the Complaint, another injury alleged is that Plaintiffs

understood Vita Coco to be produced in Brazil exclusively in the early years of the Company,

but the Company then expanded production "without informing" Plaintiffs.  *See id.* ¶ 93.  In

essence, this boils down to a claim that Vita Coco owed a heightened duty of disclosure to

Plaintiffs who had purchased their products previously—one which was not met by printing the

specific production location on each unit in boldfaced, visible type on the nutrition panel—and

that Vita Coco would be liable for consumer fraud if it did not proactively disavow its Brazilian

beginnings and the whimsy of its Brazilian-inspired tropical brand.  But as the court in *Dumas*

observed in dismissing similar allegations about Red Stripe Beer, although "[c]onsumers who

used to buy Red Stripe when it was made in Jamaica might very well continue to buy the product

without bothering to read the packaging or labeling under the assumption that it is still brewed in

Jamaica," those consumers had no claim against Red Stripe's manufacturer which was not under

any "duty to completely change the packaging or include words such as 'DOMESTIC' or 'local

ingredients' to alert such consumers of a change."  *Dumas*, 2016 WL 1367511, at *5.

**C.     Other Vita Coco Marketing Cited in the Complaint**

Plaintiffs cherry-pick from Vita Coco's website a series of references to Brazil (*e.g.*,

Compl. ¶¶ 35-36), none of which rise to the level of misrepresentations.  On the contrary, other

portions of *the same website* cited in the Complaint flatly contradict Plaintiffs' narrative that Vita Coco contrived to hide its non-Brazilian production.[9]

### 1.   Vita Coco's Website

Plaintiffs cannot have it both ways.  The story that Plaintiffs quote (selectively) from Vita Coco's website about how "Vita Coco was born" is entirely accurate and does not say or imply a thing about production source.  *See* Compl. ¶¶ 33-34.  But the same website also vividly refutes the core allegation of Plaintiffs' complaint: the suggestion that Vita Coco has hidden its international sites of production.

By way of illustration, a visitor to Vita Coco's website can view the page cited in the Complaint by clicking on "About Us" and selecting "Our Story" from a drop-down menu. http://vitacoco.com/our-story/; Compl. ¶¶ 33-34; RJN Ex. A.  From the very same menu, visitors can select a different page, "Giving Back".   http://vitacoco.com/givingback/; RJN Ex. B.  This page prominently displays a map dotted with *all* of Vita Coco's production sites.  The "Giving Back" page goes further, offering the following text:



In 2004, our founders Mike and Ira traveled to the sandy beaches of Brazil to produce the very first batch of Vita Coco with a small collective of local coconut farmers.  **Things have changed a lot since the early days (we now operate factories in tropical countries all over the world)**, but one important thing hasn't: our respect and appreciation for the people and places we rely on each day.

---

[9] Vita Coco's website is "central" to—and, indeed, is cited in support of (*see* Compl. ¶¶ 33-34, 38, 40)—Plaintiffs' claims and allegations and, accordingly, is a document that "in fairness should have been attached to the complaint."  The Court therefore may review it "at the pleading stage without converting the motion into one for summary judgment."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 n.16 (11th Cir. 1999).  *See* RJN at 6-8, Exs. A, B.

*Id.* (emphasis added).  The "Giving Back" page goes on to highlight a dozen Vita Coco projects "in the lives of the people we work with and the communities they live in," such as "Rooms for Change" (classrooms built in the Philippines); "Good Seedlings" (gifts to "our farmers" of coconut palm seedlings in Sri Lanka and the Philippines); and "What's the Buzz" ("giving bee boxes to the farmers we work with in Sri Lanka").  *Id.*  In other words, far from hiding these non-Brazilian production partners, Vita Coco touts those relationships and the related charitable endeavors with tremendous pride.

### 2.  Vita Coco's Other Brand-Building Activities

Plaintiffs cite a litany of Vita Coco's marketing efforts evoking Brazil, such as the creation of a Vita Coco-themed and Brazil-inspired bikini; a Brazilian-soccer inspired uniform worn by Vita Coco's sales representatives; Brazilian vacation contests; and whimsical questions asked during Vita Coco's hiring process.  Compl. ¶¶ 37, 39-40.  But while Plaintiffs rail against Vita Coco's efforts to "mix[] the elements of Brazil in its marketing" (*id.* ¶ 17), it does not follow that Vita Coco's imaginative nods to Brazil are a species of deceit.  If that were the case, no one could enjoy a dinner at Outback Steakhouse (featuring elements of Australia in its marketing), Olive Garden (featuring elements of Italy in its marketing), or P.F. Chang's (featuring elements of China in its marketing) without being a victim of consumer fraud.

### D.  Plaintiffs Have Not Satisfied Rule 9(b).

Because Plaintiffs have not even met Rule 8's pleading standards to identify actionable misrepresentations, they certainly have not met the more demanding burden of Rule 9(b) for their Florida and California claims. The "purpose of this heightened pleading requirement is to ensure that defendants accused of fraudulent conduct have adequate notice of the allegations so that they might defend against them."  Order Granting Defendants' Motion to Dismiss, *Alaei v. Kraft Heinz Food Co.*, Case No. 15cv2961-MMA, ECF No. 22 at 4 (S.D. Cal. Apr. 22, 2016)

15

(dismissing CLRA claim in deceptive labeling case alleging misleading "MFD in USA" statement) (citing *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1305 (S.D. 2013)).[10]

These principles are amply illustrated here. Despite pointing to the changes in Vita Coco's labeling and production sources in their Complaint over time (*e.g.*, Compl. ¶¶ 22, 29), none of the Plaintiffs explain **when** they purchased Vita Coco, other than "at all relevant times," nor **where**, other than "at retailers" in their home state. *Id.* ¶¶ 44, 47, 50. Nor do they specify **which** of Vita Coco's various marketing activities enumerated in the Complaint (*e.g.*, *id.* ¶¶ 35-40) actually caused their injury, much less which statements Plaintiffs relied upon (*Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 793-94 (9th Cir. 2012) (UCL and CLRA require actual reliance)). Indeed it is hard to see how a Vita Coco themed bikini "inspired by Vita Coco's Brazilian roots" (Compl. ¶ 39) or Vita Coco's "hiring criteria" for prospective employees (*id.* ¶ 40) deceived Plaintiffs about the production source of Vita Coco coconut water.

Even under Rule 8's more relaxed standard applicable to the New York claim, Plaintiff Gold has not explained which "material deceptive acts" caused her injury. *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000). "If the plaintiff did not see any of these statements," then those statements "could not have been the cause of [her] injury, there being no connection between the deceptive act and the plaintiff's injury." *Gale v. Int'l Bus. Machs. Corp.*, 781 N.Y.S.2d 45, 47 (N.Y. App. Div. 2004) (dismissing NY GBL § 349 complaint for failing "to plead causation with sufficient specificity to withstand dismissal" where plaintiff did not allege

---

[10] Not only have Plaintiffs failed to meet the requirements of FRCP 9(b), they have likewise failed to meet the CLRA's requirements as well. Concurrently with the filing of the Complaint, the CLRA required Plaintiff Rechtman to file "an affidavit stating facts showing that the action has been commenced in a county described in this section as a proper place for the trial of the action." Cal. Civ. Code § 1780(d). She did not do so. "[N]on-compliance with the CLRA's affidavit requirement" requires dismissal without prejudice. *See Alaei*, ECF No. 22 at 6 (citing Cal. Civ. Code § 1780(d)).

that he saw any of the allegedly misleading statements identified in the complaint before purchasing a computer).

### IV.    Plaintiffs' Claim Of Entitlement To A Full Refund Should Be Dismissed.

Even if the Court determines that Plaintiffs have met the requirements of Article III standing and Federal Rule of Civil Procedure 9(b), the Court should nevertheless dismiss Plaintiffs' claim of entitlement to a "full refund" based on the alleged "worthlessness" of the coconut water they purchased and consumed and, instead, limit Plaintiffs' claims to the "price premium" theory of damages.   For each type of claim set forth in the complaint, a plaintiff's damages are measured by the additional money—*i.e.*, the price premium—paid by a plaintiff as a result of a defendant's alleged misrepresentations.[11]   Plaintiffs hope to inflate their claimed damages beyond this standard, alleging that the coconut water they purchased was "worthless" and that, as a result, they are entitled to a full refund of the purchase price.  *See* Compl. ¶¶ 2, 43, 98, 100, 101, 109, 111, 120, 129.  This theory of "worthlessness" is legally baseless, contrary to common sense, and starkly contradicted by Plaintiffs' other allegations.

Plaintiffs here have not alleged that they paid for a non-existent exclusive right to use a trade name (*see Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1294 (M.D. Fla. 2009)) or for a plumbing system that was never completed (*see Tri-County Plumbing Servs., Inc. v. Brown*,

---

[11] S*ee, e.g.*, *BPI Sports, LLC v. Labdoor, Inc*., No. 0:15-cv-62212, 2016 WL 739652, at *6 (S.D. Fla. Feb. 25, 2016) (under FDUTPA, "the standard measurement for actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered" (quotation omitted)); *Koenig v. Boulder Brands*, Inc., 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) (in false advertising context, "[a] plaintiff adequately alleges injury under GBL § 349 by claiming that he paid a premium for a product based on the allegedly misleading representations"); *In re NJOY, Inc. Consumer Class Action Litig*., 120 F. Supp. 3d 1050, 1122 (C.D. Cal. 2015) (restitution damages under UCL and actual damages under CLRA "determined by taking the difference between the market price actually paid by consumers and the true market price" (quotation and emphasis omitted)).

921 So. 2d 20, 22 (Fla. 3d DCA 1996)) or for grass seed that does not grow grass (*see In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 412 (S.D.N.Y. 2015))—or for any other truly worthless product or service.  Rather, Plaintiffs allege that their products are "worthless" simply because they were "mislabeled."  This theory has been resoundingly rejected by multiple courts in other food and beverage mislabeling cases, and their reasoning compels the same result here.  *See, e.g.*, *Reid v. GMC Skin Care USA Inc.*, No. 8:15-CV-277, 2016 WL 403497, at *15 (N.D.N.Y. Jan. 15, 2016) (dismissing allegations that eye contour cream was "worthless" where complaint did not explain "the manner in which the [product] failed"); *Swearingen v. Pac. Foods of Or., Inc.*, No. 13–cv–04157–JD, 2014 WL 3767052, at *1-2 (N.D. Cal. July 31, 2014) (describing argument that non-dairy beverages were "worthless due to their illegality" as one that "[o]ur district has repeatedly rejected"); *cf. Herazo v. Whole Foods Mkt., Inc.*, No. 14–61909–CIV, 2015 WL 4514510, at *3 (S.D. Fla. July 24, 2015) (dismissing claim for injunctive relief because complaint described homeopathic medications as "worthless" and was therefore inconsistent with intent to purchase product in future).

Moreover, Plaintiffs' "worthlessness" theory collapses under the weight of their own allegations—even ***they*** do not believe that the coconut water they purchased was "worthless." Plaintiffs acknowledge that they "consistently" purchased and consumed Vita Coco (which they would not have done were the product truly devoid of value), Compl. ¶ 44, 47, 50, and even admit that they "would purchase Vita Coco again" if it were labeled and marketed differently (or, presumably, if they were to read the existing label and determine that they were purchasing Vita Coco produced in Brazil).  Compl. ¶¶ 46, 49, 52; *see Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1335 (S.D. Fla. 2007) (dismissing unjust enrichment and FDUTPA claims, among others, reasoning that plaintiffs were "not entitled to recover any damages since they undisputedly still

choose to purchase" the allegedly mislabeled product, even after learning "the 'truth' regarding its alleged lack of coronary benefits"); *cf. Herazo*, 2015 WL 4514510 at *3 (reasoning that "[t]he only logical deduction" from the plaintiffs' description of a product as "worthless" is that they "will not be purchasing [it] in the future").   Accordingly, the portions of the Complaint characterizing Vita Coco's coconut water as "worthless" should be stricken and Plaintiffs' damages sought should be limited to the "price premium"—if any—that they paid as a result of Vita Coco's allegedly deceptive marketing and labeling.

**V.  The Court Should Deny Leave To Amend.**

The Court should deny leave to amend because the flaws in the Complaint cannot be cured.  No amendment will change the fact that Plaintiffs do not know whether or not they were injured by a purchase of Vita Coco coconut water sourced from a country other than Brazil.  No amendment will change the fact that Plaintiffs have no injury to bring injunctive relief, because their ***current*** knowledge remains the same, as does their ability to discern Vita Coco produced in Brazil from that produced elsewhere simply by examining the current label.  No amendment will convert the puffery of "Born in Brazil" into actionable fraud, nor could amendment render it reasonable for consumers to ignore the country of origin statement an inch (and often less) away. No amendment could transform Vita Coco's embrace of Brazilian themes and elements in its marketing into a nefarious plan of deception redressable by consumer protection laws.   Because any amendment would be futile, the Court should dismiss Plaintiffs' claim with prejudice. *Salters*, 2015 WL 2124939, at *7.

**CONCLUSION**

For the reasons set forth above, the Court should dismiss Plaintiffs' claims in their entirety.   And because Plaintiffs cannot cure their claims with an amendment, the dismissal should be with prejudice.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2) Vita Coco respectfully requests a hearing on its Motion to Dismiss at the Court's earliest convenience.  Vita Coco believes a hearing is warranted here, to assist the Court in resolving the potentially case dispositive nature of Vita Coco's motion. Vita Coco estimates that approximately thirty (30) minutes would be sufficient to allow the parties to explain their positions and answer any questions the Court may have.

Dated:  May 13, 2016

Respectfully submitted,

/s/ *Melissa Pallett-Vasquez*
MELISSA C. PALLETT-VASQUEZ
Florida Bar No. 715816
mpallett@bilzin.com
LORI P. LUSTRIN
Florida Bar No.  59228
llustrin@bilzin.com
**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
1450 Brickell Ave, Suite 2300
Miami, Florida 33131
Tel.: (305) 374-7580  Fax: (305) 374-7593

and

SCOTT VOELZ *(admitted pro hac vice)*
svoelz@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 18th Floor,
Los Angeles, CA 90071
Tel: (213) 430-6680  Fax: (213) 430-6407

HANNAH Y. CHANOINE *(admitted pro hac vice)*
hchanoine@omm.com
CHRISTOPHER S. COGBURN *(admitted pro hac vice)*
ccogburn@omm.com
**O'MELVENY & MYERS LLP**
Times Square Tower, 7 Times Square,
New York, NY 10036
Tel: (212) 326-2128  Fax: (212) 326-2061
*Attorneys for Defendant All Market Inc.*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on May 13, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

<u>/s/ *Lori P. Lustrin*         </u>
Lori P. Lustrin