**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO: 1:16-CV-21238-Scola/Otazo-Reyes**

JOSHUA WASSER, ILA GOLD, and
ROBERTO ISRAEL J. BARAJAS-RAMOS,
on behalf of  themselves and all others
similarly situated,

   *Plaintiffs*,

v.

ALL MARKET INC.,

   *Defendant*.

_____

**DEFENDANT ALL MARKET, INC.'S REPLY IN SUPPORT OF ITS
MOTION TO EXCLUDE THE REPORTS, OPINIONS, AND TESTIMONY OF
<u>CLAUDIU V. DIMOFTE AND CHRISTIAN TREGILLIS</u>**
*(Filed Under Seal Pursuant to D.E. 224 )*

Defendant All Market Inc. ("AMI") replies to Plaintiffs' Response in Opposition to Defendant's Motion to Exclude the Reports, Opinions, and Testimony of Dr. Claudiu V. Dimofte and Christian Tregellis ("Plaintiffs' Response") [D.E. 222] in further support of its Motion to Exclude the Reports, Opinions and Testimony of Claudiu V. Dimofte, Ph.D. ("Dimofte") and Christian Tregillis, CPA, ABV, CFF, CLP ("Tregillis") ("Daubert Motion") [D.E. 204].

### Preliminary Statement

Plaintiffs suggest that AMI's Daubert Motion "quibbles with minor aspects" of the analyses performed by Dimofte and Tregillis.  Nothing could be further from the truth. The flaws identified in the Daubert Motion go to the very heart of each expert's opinions.

The best evidence of this is that Plaintiffs felt compelled to file new declarations from both experts[1] which—more than two months after the previously extended deadline for serving expert reports, and, after each expert was already deposed—unveil for the first time entirely new bases for each expert's opinions.  These declarations are improper and should be disallowed.

Regardless, the new declarations do nothing to remedy the deep, foundational flaws in each expert's analyses. For example, neither Plaintiffs' Response nor the Dimofte Declaration disputes that the Conjoint Analysis[2] only considered the so-called "price premium"[3] between coconut water produced in Brazil as compared to coconut water produced in the Philippines, and did not consider the "price premium," if any, of coconut water produced in Brazil compared to coconut water produced in Indonesia, Thailand, or Sri Lanka where approximately 80% of the 1-liter unflavored Vita Coco coconut water at issue in Plaintiffs' Motion for Class Certification

---

[1] Declaration of Dr. Claudiu V. Dimofte  [D.E. 221 ]("Dimofte Declaration"); Declaration of Christian Tregillis [D.E. 220] ("Tregillis Declaration").

[2] The "Vita Coco Conjoint Project" (hereinafter "Conjoint Analysis") discussed in Dimofte's Report dated May 11, 2018 ("Dimofte Report") attached as Ex. 1 to AMI's Notice of Filing Exhibits to Motion to Exclude the Reports, Opinions, and Testimony of Dimofte and Tregillis [D.E. 205]. All references herein to "Ex._" refer to the exhibits appended to D.E. 205.

[3] In his Report, Dimofte explained that among the "goals" of the Conjoint Analysis was to "quantify the price premium that consumers place on a specific perceived product manufacturing origin."  Dimofte Report, p. 3.  Although "price premium" was the terminology used by Dimofte, he admitted in deposition that a "price premium" is not what his Conjoint Analysis actually measured, repeatedly explaining that it measured only "willingness to pay" and not a price premium. *See* Dimofte Depo. at 105, 224-225, 231 attached as Ex. 2 to D.E. 205.

("1L") was produced during the class period.  No matter how many previously undisclosed articles or other data Dimofte belatedly comes up with to try to salvage his Conjoint Analysis, Plaintiffs cannot change this fact. Nor can Plaintiffs change that there is no basis for Dimofte's assertion that all Southeast Asian nations can be lumped together based on a "stereotype" that these countries are all the same and are all "less desirable" than Brazil as sources of coconut water to the same extent as the Philippines.  As one might expect, the use of this "stereotyping" to try to make the Conjoint Analysis fit the facts of this case is not actually a "methodology," let alone a reliable methodology under *Daubert.*

Dimofte made a mistake.  He failed to use the correct countries in his Conjoint Analysis, just as he failed to follow any methodology whatsoever in choosing the other attributes to include in his Conjoint Analysis, and just as he failed to follow any of the accepted standards for survey research in conducting his Perception Survey.[4]  *Daubert* demands much more.

As to Tregillis, rather than address head-on Tregillis' "methodology" in choosing the product attributes to include in his Hedonic Regression Analysis[5] (although attribute selection is recognized by the case law as critical to the reliability of a regression analysis), Plaintiffs spend most of their defense of Tregillis touting his qualifications and experience as a financial expert and the fact that hedonic regressions have been previously approved by certain courts.  AMI did not dispute these points in its Daubert Motion nor does it now.

Tregillis' qualifications as a *financial* expert, however, cannot change that he is <u>not</u> (as Plaintiffs admit) a *marketing* expert.   And, that hedonic regressions have sometimes been accepted in other cases is irrelevant; not a single one of those case involved Tregillis' "methodology" of choosing product attributes for inclusion into his regression based on his subjective determination of what he perceived to be a "marketing message."  As explained in the Daubert Motion, in Tregillis' unique regression model, the <u>only</u> product attributes included were selected from "product marketing phrases" on the packages of different brands of coconut water which Tregillis and his staff reviewed.  Thus, Plaintiffs' $200 million claim rests on Tregillis' subjective determination of what constituted a "marketing message" based on rules he came up

---

[4] The "Vita Coco Consumer Survey" (the "<u>Perception Survey</u>") discussed in the Dimofte Report.
[5] The hedonic regression analysis ("<u>Hedonic Regression Analysis</u>") discussed in Tregillis' May 11, 2018 expert report ("Tregillis Report") attached as Ex. 9 to D.E. 205.

with—such as whether a "bullet point" was used in front of a word or phrase, whether a particular phrase was part of a list or sentence, where on the package a particular word or phrase appeared, and the font size of a particular word or phrase (although at deposition Tregillis could not articulate any objective size measurement he utilized). There is nothing scientific or reliable about these rules or the haphazard way Tregillis applied them. Plaintiffs' suggestion that this "methodology" is sufficiently reliable to justify admission of the Hedonic Regression Analysis is really a request for this Court to completely abdicate its role as gatekeeper.

Just as important as the attributes included in the Hedonic Regression Analysis are the product attributes—such as brand—which Tregillis <u>failed to include</u>. As the cases cited by Plaintiffs themselves makes clear, to be admissible, a hedonic regression must at the very least "account for the major factors" affecting price. Tregillis' analysis assumes that the only factors that contribute to price differentials are the words or phrases from package labels that he deemed to be marketing phrases, rather than other product attributes such as the brand or taste of the product. Not only does Tregillis' failure to control for the price premium attributable to the Vita Coco brand fail to comport with the requirements of the Supreme Court's decision in *Comcast*,[6] but this failure also requires exclusion of his Hedonic Regression Analysis under *Daubert*.

In short, for the reasons discussed in its Daubert Motion and herein, AMI respectfully submits that there are multiple, truly fundamental flaws in each expert's analyses that render each expert's opinions in this case worthless, and at the very least unreliable and unhelpful.

---

[6] Plaintiffs decline to address *Comcast* in their class certification briefing, and instead direct the Court to their Daubert Response. But the Daubert Response contains only passing references to *Comcast*, contains no explanation for how Plaintiffs can establish damages on a class-wide basis under the *Comcast* standard, and does not discuss the case law cited in AMI's Opposition to Class Certification. *See* D.E. 207 at 20-24; *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, *11 (N.D. Cal. 2014)(regression insufficient under *Comcast* due to failure to control for brand loyalty); *Brazil v. Dole, LLC,* 2014 WL 5794873, *9 (N.D. Cal. 2014) (it is "essential that [expert's] model control for brand loyalty;" noting that "what the Court wants to know is that the proffered damages model isolates the price premium attributable to [the] labeling claim only, rather than any premium attributable to consumers' loyalty to the [] brand."); *In re Scotts EZ Seed Litig.,* 304 F.R.D. 397, 413 (S.D.N.Y. 2015)("Courts routinely reject price premium methodologies under *Comcast* when the proposed methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement....courts correctly point out consumers may pay a higher price for a product for many reasons that have nothing to do with specific advertising claims, including brand loyalty and product quality.").

# ARGUMENT

## I.    THE NEW DECLARATIONS ARE IMPROPER AND THE NEW PURPORTED BASES FOR EACH EXPERT'S OPINIONS SHOULD BE DISALLOWED

Rule 26(a)(2)(B) requires that an expert report contain "(i) a complete statement of all opinions the witness will express <u>and the basis</u> and reasons for them; [and] (ii) <u>the data or other information considered by the witness in forming them</u>."[7]  Now, more than two months after this Court's already extended deadline for disclosure of expert reports[8] and after each expert was deposed, Plaintiffs disclose numerous new bases for each expert's opinions.  This violation of Rule 26 should not be countenanced by the Court and the new bases should be disallowed.

The Eleventh Circuit has made clear that all support for an expert's opinion must be timely disclosed, and has explained the appropriate sanctions pursuant to Rule 37[9] for failing to do so.  *See, Mitchell v. Ford Motor Co.,* 318 Fed. Appx. 821, 822 (11th Cir. 2009).  In *Mitchell*, plaintiffs' expert submitted an expert report which relied on three scientific papers to support his opinion.  *Id.*  During the expert's deposition, the expert referenced only these three papers as the basis for his opinions.  *Id.*  After deposition, in connection with a *Daubert* challenge, the expert disclosed several additional papers which formed the basis of his opinions. *Id.* The Eleventh Circuit affirmed the district court's decision <u>not</u> to consider the belatedly disclosed bases of the expert's opinions, and the resulting decision to exclude the expert's opinions <u>in full</u> because the opinions lacked sufficient support. *Id.*  The same result is appropriate here.

Indeed, Plaintiffs' Rule 26 violations are far worse than in the *Mitchell* case.  Dimofte's Report does not even mention in any way the country of origin stereotyping theory that is the <u>only</u> basis on which he now argues the Conjoint Analysis has any relevance to this case.  At his deposition (taken after AMI had served the Rebuttal Reports pointing out Dimofte's failure to consider the correct countries of production), Dimofte unveiled for the first time his theory that

---

[7] Unless otherwise noted herein, all emphasis is added.

[8] The Amended Scheduling Order granting Plaintiffs' motion to enlarge the deadline states "**the Court expects the parties to comply with the deadlines set forth below and will not grant any further extensions of time absent particularly extenuating circumstances.**" [D.E. 147] (emphasis in the original).

[9] Rule 37 provides that "[i]f a party fails to provide information . . .as required by Rule 26(a) or (e), the party **is not allowed to use that information** . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

because of "country of origin stereotypes" all "Southeast Asian countries" (including the Philippines, Indonesia, Thailand, and Sri Lanka) should be treated the same and are all considered less desirable than Brazil as a source of coconut water to the same extent as the Philippines.  Even at that time, however, Dimofte did not disclose any evidentiary support for his theory of the desirability of Brazil over each of the relevant countries:

> Q:     So you don't recall any research on the desirability of Brazil as a country of production compared to any other countries, right?
> A:     I don't recall that, no.
> Q:     Okay.  And you didn't recall any studies on the desirability of a country of production for coconut water at all, right?
> A:     That's true.[10]

And, as to treating all Southeast Asian countries the same, Dimofte identified two authors that had purportedly studied this, but admitted that the purported research (he did not provide any publication names) was not referenced in his Report and did not relate to coconut water.[11]

At no time after the deposition did Plaintiffs request to supplement Dimofte's Report or provide AMI with any support for his stereotyping theory.  But the Dimofte Declaration now discloses **at least six new, never before referenced articles, studies and other data**[12] (as to some new information, Dimofte simply does not provide a source) which supposedly support Dimofte's contention that all "Southeast Asian countries" should be treated the same and are all less desirable than Brazil.  None of these new sources actually support anything Dimofte states.  Regardless, however, Plaintiffs' continued, blatant disclosure violations should not be allowed.

---

[10] Dimofte Depo. at 83.

[11] Dimofte Depo. at 95-98 at D.E. 217.  Ironically, no publications or research by these authors is cited in the Dimofte Declaration.

[12] Dimofte Declaration, ¶¶ 47-50 citing (1) Hahn, C.M. (1989). Country image: Halo or summary construct, *Journal of Marketing Research*; (2) U.S. Census Bureau (2016), Foreign Trade; (3) Gallup Org. data; (4) Sharma, P. (2011), Country of origin effects in developed and emerging markets: Exploring the contrasting roles of materialism and value consciousness, *Journal of International Business Studies*; (5) Moomaw, Ronald L., and Ali M. Shatter (1996), Urbanization and economic development: a bias toward large cities? *Journal of Urban Economic development*; and (6) Pew Research Center (2013), Which countries Americans like and . . . don't.

Tregillis' Declaration also violates Rule 26(a)(2).  For example, for the first time, Tregillis discloses an article[13] that supposedly supports the omission of a brand variable from his Hedonic Regression Analysis and for the first time discloses a measurement he did not disclose in deposition.[14]  He also gives additional opinions not included in his Report about the inappropriateness of considering sales by certain coconut water manufacturers included in his own schedule.[15]

There is no justification for these belated disclosures—Plaintiffs have literally had years to retain experts and appropriately disclose their opinions.  As this Court observed in *Aponte*, "[p]art of the diligence required is engaging an expert early enough, ensuring that the expert understands exactly what is expected of him, and allowing enough time to handle obstacles that, though not necessarily foreseen, are nonetheless predictable."  *Aponte v. Royal Caribbean Cruises, Ltd,* 2016 WL 2997421, *2 (S.D. Fla. 2017)(Scola, J.)(denying extension of deadline for expert reports).  Time and time again, Plaintiffs have failed to demonstrate this required diligence and instead have attempted to ambush AMI with late disclosures.  Pursuant to Rule 37, this Court should disallow all new bases for each expert's opinions included in the Declarations.

## II. DIMOFTE'S REPORTS, OPINIONS AND TESTIMONY ARE INADMISSIBLE UNDER *DAUBERT* AND RULE 702

### A. Dimofte is Unqualified in Conjoint Analysis

In its Daubert Motion, AMI pointed out that Dimofte himself does not believe he is an expert in conjoint analysis:

Q:     Do you believe you're an expert in conjoint analysis?
A:     I'm **not sure** how you define expert.  I am familiar and comfortable with conjoint analysis.
Q:     In what areas do you believe you are an expert?
A:     I did offer the research areas earlier that are most commonly my interests and I publish most in and they have to do **with implicit information processing, attitude formation and such, international marketing**.

---

[13] Tregillis Declaration, p.11 (citing *Ruder and To*).

[14] In his Declaration (¶17), Tregillis explains that he did not consider a particular phrase on a Zico label to be a "marketing phrase" because, *inter alia,* it was written in "letters approximately 1.5mm tall."  But at deposition, Tregillis could not identify any specific font size which he considered too small for inclusion in the Hedonic Regressions Analysis, and testified it was simply "a judgment call." Tregillis Depo. at 160 attached as Ex.14 to D.E. 205.

[15] Tregillis Declaration, ¶41.

***

Q:    So **those** are the areas you really believe you're an expert in?

A:    **Yes**.

Daubert Motion at 5 (quoting Dimofte Depo. at 50).  In response, Plaintiffs claim that "AMI does not cite to Dr. Dimofte's complete testimony,"[16] but then go on to quote the very same "I am familiar and comfortable" language quoted by AMI.  As Dimofte himself recognized in making the distinction, being "familiar" or "comfortable" with a methodology is a far cry from being an expert in that methodology.  Indeed, Plaintiffs are actually left arguing that the "self-evaluation"[17] of a proffered expert should not be dispositive.

And, while Dimofte now tries to explain away his deposition testimony in his Declaration, his explanation just digs the hole deeper.  Specifically, Dimofte states that the reason he testified that he did not believe he was an expert in conjoint analysis is because he has never published any papers on conjoint analysis and "[i]n academia one is generally considered an expert in areas in which he or she is published."[18] Dimofte's admission that he is not considered an expert in conjoint analysis within his own academic world, of course, only underscores that he cannot be qualified as an expert in conjoint analysis in this case.[19]

Finally, though Dimofte now states in his Declaration that he has "doctoral level training in the conjoint technique and ha[s] studied various conjoint methods," according to his deposition testimony all this supposed "training" really consisted of *one* course that addressed research methods generally, that *included* some discussion of conjoint analysis.[20] As Dimofte admitted in a moment of candor at his deposition, he is simply not an expert in conjoint analysis and for this reason alone his Conjoint Analysis should be excluded.[21]

---

[16] Plaintiffs' Response, p. 4.

[17] Plaintiffs' Response, p. 3.

[18] Dimofte Declaration, ¶9.

[19] *See Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)(*Daubert* requires the court to make certain that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field;" stating "it will at all times be useful to ask . . .whether his [the expert's] preparation is of a kind that others in the field would recognize as acceptable.").

[20] Dimofte Depo. at 44-45.

[21] *Wolf v. Hewlett Packard Co.*, 2016 WL 7743692,*6 (C.D. Cal. 2016)(excluding purported expert on conjoint analysis even though he had been retained as an expert in over 200 cases,

**B. Dimofte's Opinions Must be Excluded—He Now Contends He Wrote the Majority of his Expert Report Before Actually Running Either of his Studies**

The Dimofte Declaration also exposes additional problems with the reliability of Dimofte's opinions as to both the Conjoint Analysis and the Perception Survey. Specifically, as Dimofte testified, the Perception Survey and the Conjoint Analysis were both run entirely on the morning of May 11, 2018, the very same day Dimofte's expert report was served on AMI:

Q:   What were the dates of the surveys?
A:   I think it was May 11th.
Q:   May 11th? Okay. Is that the date of your expert report?
A:   Yes.
                                    ***
Q:   So it was—the survey was **only run on the morning of May 11**.
A:   **Yes**.
Q:   Okay. And the conjoint analysis was **only run on the morning of May 11**.
A:   **Yes,** I think so.[22]

Dimofte further testified that "[i]t was last minute, if you want—want to call it that" and explained "[i]f that could be avoided, that would be better but that's what happened." [23]

Now, however, Dimofte states in his Declaration: "I had already structured **the major portions of the report prior to** the final data collection [on May 11, 2018]. Thus my work during the final day simply involved completing the missing parts of the already structured document once the data analyses were performed . . . Clearly this work was **neither laborious nor lengthy and could be easily performed** in a few hours by any competent researcher."[24]

This is significant for two reasons. First, in deposition, Dimofte was specifically asked about the portions of his Report which he had drafted prior to "final data collection" *i.e*, prior to actually running the surveys on which his Report was supposed to be based. He testified that he had just drafted the headings for the different sections of his Report:

Q:   Had you already drafted your report at the time you received the survey results?

---

because he did not have expertise specifically in the area of conjoint analysis); *Khoday v. Symantex Corp.*, 93 F. Supp.3d 1067, 1079 (D. Minn. 2015)(rebuttal expert not allowed to testify regarding purported flaws in another expert's conjoint analysis where rebuttal expert had only general marketing expertise but had not been specifically trained in conjoint analysis).

[22] Dimofte Depo. at 105-106, 107.
[23] Dimofte Depo. at 106-107.
[24] Dimofte Declaration, ¶11.

A:    There was a rough draft of a report in the absence of data in terms of the sections, if you will.

Q:    Well, how did you know what opinions you were going to render before seeing the results of the surveys?

A:    The draft didn't include opinions.  It included sections, **headings if you will**.

Q:    So it's your testimony that your draft report included **only headings** but did not contain any substantive opinions **until you received the results on the day of May 11th at which time you drafted your 11 page single spaced report**.

A:    That's when I had the analysis done and I circulated it in the report, **yes**.[25]

More importantly, it is mind-boggling that Plaintiffs and Dimofte are now arguing that Dimofte's Report was written in large part *before* Dimofte ran either the Perception Survey or Conjoint Analysis.  Dimofte is either misrepresenting in his Declaration the amount of work done prior to running the Perception Survey and Conjoint Analysis or, worse, he is now telling the truth and he had reached his so-called "expert" opinions even before running his contrived surveys on May 11.  It is difficult to conceive of more significant indicia of lack of reliability.

### C. The Conjoint Analysis Must Be Excluded Because Dimofte's Stereotyping Theory Is *Not* a Reliable Methodology

Dimofte's Report does not contain a single word about a "country of origin stereotyping" theory.  Dimofte simply constructed his Conjoint Analysis to only compare the "utility" that Vita Coco buyers place on coconut water thought to be produced in Brazil as compared with coconut water thought to be produced in the Philippines.[26]  And, the conclusions drawn from his Conjoint Analysis are that "a package thought to be produced in Brazil commands a price that is on average $.21 higher than one thought to be produced in the Philippines" and that "a package thought to be produced in Brazil commands a market share that is on average 20.98% higher than one thought to be produced in the Philippines."[27]  Even ignoring the significant deficiencies of the Conjoint Analysis as between Brazil and the Philippines, there is no discussion whatsoever in the Report about extrapolating these flawed results to packages thought to be produced in Indonesia, Thailand, or Sri Lanka.  These countries are mentioned nowhere in his Report.

This is because at the time Dimofte constructed and ran the Conjoint Analysis (or during the time he wrote his Report prior to running the Conjoint Analysis), Dimofte apparently was not

---

[25] Dimofte Depo. at 106-107.

[26] Dimofte Report, p. 7.

[27] Dimofte Report, p. 9.

aware of the fact that the vast majority of unflavored Vita Coco 1L Singles (the only product at issue in Plaintiffs' motion for class certification) were NOT produced in the Philippines during the class period, but rather in Indonesia, Thailand, and Sri Lanka.  In their Rebuttal Reports, both of AMI's experts, Dr. Steckel[28] and Dr. Ugone,[29] pointed out this error.  AMI is at a complete loss as to why Plaintiffs state "neither of AMI's experts weighs in on this purported issue at all"[30]—it was AMI's experts who first clued Dimofte in to this problem.

Because the Rebuttal Reports were served prior to his deposition, Dimofte had cobbled together his "country of origin stereotyping" theory by the time he was deposed.  As discussed above, however, even at his deposition, other than identifying two authors, he disclosed no support for this theory whatsoever.[31] And, even he admitted, that this "stereotyping" he claims exists depends on the particular product at issue[32] (such as his "Swiss watch" example), and that he is not aware of any literature whatsoever discussing such "stereotypes" in the context of coconut water.[33]

Now, despite his best efforts to salvage his Conjoint Analysis through his belated Declaration, Dimofte still cannot come up with anything relating to coconut water, let alone a comparison of the countries at issue as sources of coconut water.  None of the new "support" for

---

[28] Steckel Rebuttal attached as Ex. 5 to D.E. 205, p. 34 ("the Dimofte Report has not undertaken any research as to whether, and to what extent, a particular country is an undesirable (or desirable) 'product place of origin' for unflavored coconut water.  In addition to the Philippines, Vita Coco unflavored coconut water is produced in Thailand, Indonesia, and Sri Lanka.  By choosing to focus on the Philippines, the Dimofte Report implies that the Philippines is 'generally perceived to represent a less desirable product place of origin.' There is no basis to this and thus the Dimofte Report cannot claim to fulfill its objective as stated."), pp. 44-45 (explaining that the Conjoint Analysis should have provided options for "production locations such as Thailand, Indonesia, and Sri Lanka.").

[29] Ugone Rebuttal, p. 54 attached as Ex.7 to D.E. 205 ("Dr. Dimofte did not explain why he only attempted to measure a claimed difference in willingness to pay for a package thought to be produced in Brazil relative to a package thought to be produced in the Philippines (without performing similar comparisons between Brazil and other countries of origin for the Challenged Products, such as Indonesia, Thailand, and Sri Lanka).").

[30] Plaintiffs' Response, p.16.

[31] Dimofte Depo. at 83, 95-98 at D.E. 217.

[32] Dimofte Depo. at 78-79, 92.

[33] Dimofte Depo. at 76, 79, 83.  Ironically, Nam Hom coconuts, used in premium coconut water, grow *only* in Thailand. Dimofte was not familiar with Nam Hom coconuts. *Id*. at 83.

his country of origin stereotyping theory identified in his Declaration <u>has anything whatsoever to do with coconut water</u>. This alone dictates that the Conjoint Analysis be excluded. Again, there is no evidence that the conclusions of the Conjoint Analysis related to the Philippines have any application to Indonesia, Thailand, and Sri Lanka where the vast majority of the coconut water was produced. The Conjoint Analysis purported relevance is thus based on sheer speculation (frankly, insulting speculation), not the reliable methodology demanded by *Daubert*. [34]

Indeed, the new arguments proffered by Dimofte simply make no sense and are indicative of the far-fetched ideas Dimofte is willing to throw against the wall. For example, Dimofte's newly unveiled "percentage of import" support for his stereotyping theory appears to posit that a country is more or less desirable as a country of origin of a product depending on the size of its exports to the United States. [35] But in 2016 (the year Dimofte addresses), Spain only had $13.4 billion in exports to the United States, [36] but many American consumers know that Spanish ham is among the best in the world. Colombia only had $13.7 billion, but Americans still drink Colombian coffee. Russia only had $14.5 billion, but we still drink its vodka. And, Belgium only had $17 billion, but we still like Belgian chocolate. The list could go on and on. And, under Dimofte's new GDP/capita argument [37] (putting aside that many people do not know what GDP/capita is), we would all want our products from Monaco, then Liechtenstein, then Luxemborg and so on. [38] The icing on the cake is that Malaysia actually has a higher GDP/capita than Brazil, supposedly proving, according to Dimofte's GDP/capita theory, that coconut water from Malaysia is actually more desirable than coconut water from Brazil (although Malaysia is a Southeast Asian country in ASEAN and thus supposedly less desirable). Enough.

---

[34] Dimofte's "stereotyping" theory is untested as to coconut water and the specific countries at issue, has not been the subject of peer review and publication, does not have a known rate of error, and is not generally accepted by the scientific community. *See Rink,* 400 F.3d at 1291.

[35] Dimofte Declaration, ¶ 47.

[36] All of the figures for 2016 exports to the United States in this paragraph are taken from https://www.census.gov/foreign-trade/balance/index.html.

[37] Dimofte Declaration, ¶ 49.

[38] All GDP data is from https://unstats.un.org/unsd/snaama/dnllist.asp (Per Capita GDP in US Dollars: All countries and regions/subregions (totals) for all years—sorted by region/subregion)

Because the required "fit" between the Conjoint Analysis and the facts of the case is totally absent, the Conjoint Analysis is both irrelevant and unhelpful to the trier of fact, would be misleading and confusing to a jury under Rule 403, and should be entirely excluded.[39]

### D. The Conjoint Analysis Must Be Excluded Because it Omits Key Variables in Order to Manufacture the Significance Attributed to Place of Origin

In its Daubert Motion, AMI pointed out that Dimofte had utilized absolutely no methodology in selecting the product attributes to include in his Conjoint Analysis.[40]  As AMI explained, the only explanation in his Report as to how the product attributes were chosen for the Conjoint Analysis was one sentence, without citation, which stated: "the specific choice of attributes was based on marketplace information and Vita Coco internal market research documents."[41]  The Daubert Motion also explained that, in deposition, Dimofte testified that this statement meant that in choosing the product attributes he had relied on (1) his own personal opinion (as a non-coconut water drinker) of the "reasonable product benefits" of Vita Coco; and (2) a single internal AMI document known as the Toluna Survey.[42]  AMI then went on to discuss at length how the Toluna Survey does not support the attributes chosen by Dimofte, particularly because the Toluna Survey (like the Steckel Purchase Driver Study and an article cited by Dimofte in his Report) reflects the importance of taste and brand to consumers and certainly does not identify "product origin" as a reason consumers choose Vita Coco.[43]

---

[39] *Cotromano,* 2018 WL 2047468 at * 14 ("Fit requires a 'connection between the scientific research or test result to be presented and particular disputed factual issues in the case'"); *Kyle Cannon v. BP Prods. N. Am., Inc.*, 2013 WL 5514284, *7 (S.D. Tex. 2013)(excluding expert analysis where the expert's "overarching theory of damages [wa]s disconnected from Plaintiffs' causes of action."); *In re POM Wonderful LLC*, 2014 WL 1225184, *5 and *9, n.7 (C.D. Cal. 2014) (finding "price premium" model did not comport with *Comcast* requirement that class-wide damages model be tied to plaintiff's legal theory, and finding that "[f]or these and related reasons, [expert's] report and testimony are not admissible under *Daubert."*).

[40] Daubert Motion, pp. 15-19.

[41] Dimofte Report, p.7.

[42] Dimofte Depo. at 147-148.  Later in the deposition, Dimofte claimed that his own personal opinion was shaped by undisclosed "on-line searches looking at what people talk about when they discuss the brand." *Id.* at 159-160. However, Dimofte had no record of these searches nor could he recall the terminology allegedly used in running these searches.  *Id.* at 160-161.

[43] Daubert Motion, pp. 16-17.

Plaintiffs say nothing in response, but simply go back to generalities, stating "Dimofte's opinions and testimony show that he considered the issues raised by AMI and made, valid, professional judgments as to how to run the conjoint analysis" (ironically citing only Dimofte's Declaration and not his Report or deposition testimony).  In his Declaration, Dimofte argues in essence that it would be difficult or impossible to include taste or brand in a conjoint analysis.

But even assuming this is true (which it is not), why would it make Dimofte's faulty Conjoint Analysis any more admissible?  Exactly as in *Oracle Am., Inc. v. Google, Inc.,* 2012 WL 850705, *10-11 (N.D. Ca. 2012), Dimofte manufactured the significance assigned to country of origin in his Conjoint Analysis because respondents were  "artificially forced to focus on [in this case, country of origin] even if in the real world [this] was unimportant to them" and "this problem was exacerbated by the fact that important features"—such as the attributes of taste and brand in this case—were left out of the conjoint analysis. *Id.*   If Dimofte could not design a conjoint analysis that included the important product attributes, he should have picked another methodology or not taken the assignment.  And, neither Dimofte nor Plaintiffs respond in any way to the fact that even worse than in *Oracle,* in this case, to further artificially increase the significance assigned to the "origin" attribute, Dimofte assigned more levels[44] (*i.e,* the number of choices for a given attribute to be tested in the analysis) to the "origin" attribute than to any of the other three attributes in his Conjoint Analysis.

There can be no question that the Conjoint Analysis was structured to artificially force respondents to attach significance to "origin" and that thus the results are completely manufactured, unreliable and should be excluded.

### E.   The Perception Survey Must be Excluded as Both Unreliable and Unhelpful

As to the Perception Survey, suddenly the "focal item" of the entire survey is simply one survey question in which various images of a Vita Coco 1L Single were shown to respondents.[45] Plaintiffs argue that "no criticism from AMI goes to the Focal Item."  This is wrong.  In its Daubert Motion, AMI explained that this question was improper because the heightened

---

[44] Dimofte Depo at 192 (admitting that the "primer" on conjoint analysis states "that the number of levels used to define an attribute can have a significant bearing on the results."), at 194 (admitting that generally "all else being equal attributes defined by more levels tend to get more importance."); Steckel Rebuttal Report, p. 44 (discussing authorities on number of levels issue).
[45] Plaintiffs' Response, pp. 6-7.

exposure to the "born in brazil" phrase through the multiple images shown to respondents does not simulate consumer exposure to the "born in brazil" phrase in the marketplace and thus the question lacks required external validity.[46]

Plaintiffs' focus on this question is odd because the answers to this question reveal that 66 percent of respondents who viewed the "born in brazil" phrase did <u>NOT</u> believe that Vita Coco is manufactured in Brazil even with the flawed study.[47]  And, certainly the question did not ask whether the "born in brazil" phrase motivated any respondent's purchase of Vita Coco so the question cannot possibly constitute the materiality study required for class certification.[48]

Regardless, given that the answers to this question also reflect that the exposure to the "born in brazil" phrase caused the percentage of respondents who believed Vita Coco is produced in the United States and Mexico to go up (and Dimofte offers no explanation for these results) the survey results as to this question especially lack any reliability.  As to the other questions in the Perception Survey—questions which are so indefensible that in deposition Dimofte was forced to repeatedly say they were not "germane to the main effect of the study"[49]—AMI simply incorporates the discussion from its Daubert Motion[50] rather than burden the Court with duplicative briefing.  Suffice it to say that the lack of external validity and the ambiguous, leading, biased and otherwise inappropriate questions utilized by Dimofte in the Perception Survey rise to the level of fundamental flaws which render the survey inadmissible.

### III. TREGILLIS' REPORTS, OPINIONS AND TESTIMONY ARE INADMISSIBLE UNDER *DAUBERT* AND RULE 702

#### A. The "Methodology" Utilized by Tregillis in Choosing the Product Attributes to Include in the Hedonic Regression Analysis Disqualifies the Entire Analysis

Plaintiffs spend very little time discussing the unique "methodology" utilized by Tregillis to select which product attributes to include in his Hedonic Regression Analysis.  Plaintiffs state

---

[46] Daubert Motion, pp. 10-11.

[47] Dimofte Report, p.5

[48] *See* D.E. 207, pp.15-17.  The cases Plaintiffs rely on to argue they can establish materiality on a class-wide basis are thus inapposite since those involved <u>materiality</u> studies which asked respondents whether statements were important to their purchasing decisions.  *See, In re NJOY Inc.,* 120 F.Supp.3d 1050, 1075 (C.D. Cal. 2015); *Oshama v. Coco-Cola Co.,* 2005 WL 1661999, * 9 (N.D. Ill. 2005).  *FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) was not a class action.

[49] Dimofte Depo. at 277, 280, 288, 289

[50] Daubert Motion, pp. 5-9.

generally "[a]s explained at deposition and (sic) Declaration, Tregillis applied a standard rule across the board, a methodology that is common and accepted for hedonic regressions."[51] But Tregillis' "marketing phrase" methodology is most certainly not common or accepted.[52] The single case Plaintiffs cite to support this claim—*In re Urethrane Antitrust Litig.,* 2012 WL 6681783 (D. Kan. 2012)—does not even involve a product labeling claim or marketing phrase of any kind, let alone a "methodology" similar to the one employed by Tregillis.

To remind the Court, Tregillis only included product features taken from "product marketing phrases" on the packages of different brands of coconut water which Tregillis and his staff reviewed.[53] Although Plaintiffs admit Tregillis is <u>not</u> a marketing expert,[54] Tregillis' "methodology" consisted entirely of his subjective determination of what he perceived to be a "marketing message" based on his review of each package (mostly from on-line pictures). In making these determinations, Tregillis came up with a series of unwritten rules such as:

*whether a "bullet point" was used to set off a particular word or phrase;[55]

*whether a particular word or phrase was included in a list;[56]

*whether a particular word or phrase was included as part of a "textual description";[57]

*where on a package a particular word or phrase was located;[58] and

* the size of the font of a particular word or phrase.[59]

In describing these rules at deposition, Tregillis could not come up with any objective descriptions, such as the particular font size which he considered too small for inclusion in the Hedonic Regressions Analysis.[60]  At deposition, he testified it was simply "a judgment call."[61]

---

[51] Plaintiffs' Response, p. 22.
[52] Tregillis himself testified he had never previously employed this approach of analyzing whether different words or phrases on a package qualify as "product marketing phrases" in performing a hedonic regression, nor was he aware of any other case in which a hedonic regression analysis was performed in this way. *See* Tregillis Depo. at 125.
[53] Tregillis Depo. at 118, 121.
[54] Plaintiffs' Response, p. 19,  n. 28.
[55] Tregillis Depo. at 156, 165-166, 167.
[56] Tregillis Depo at 164, 166, 167, 195
[57] Tregillis Depo. at 169-170, 192.
[58] Tregillis Depo. at 173-174.
[59] Tregillis Depo. at 156-157.
[60] Tregillis Depo. at 160.

In his Declaration, Tregillis now states that he did not consider certain text from a Zico package to be a "marketing phrase" because, *inter alia,* the letter font was approximately 1.5mm tall.[62]  This after-the-fact measurement only serves to underscore the completely arbitrary nature of his "marketing" determinations—the "born in brazil' phrase on the Vita Coco 1L is approximately 2mm tall (and written sideways on the back-side angled panel).  Apparently, 0.5mm is the difference between not even qualifying as a "marketing phrase" and a "marketing phrase" purportedly causing $200 million in damages.  How absurd.  There can be no question that the "methodology" used by Tregillis in selecting product attributes requires exclusion of the Hedonic Regression Analysis.  *McClain,* 401 F.3d at 1245 ("*any* step that renders [a proffered expert's] analysis unreliable under the *Daubert* factors *renders the expert's testimony inadmissible.*").

### B.  The Hedonic Regression Analysis Fails to Control for Brand and As a Result, at Best, Is Calculating the "Price Premium" Associated with the Vita Coco Brand

After using the above described "methodology," Tregillis ultimately only included in his Hedonic Regression Analysis four product variables, none of which was brand or taste.[63]  Plaintiffs argue that "AMI's attacks on Tregillis' selection of variables go to the weight of his opinions and are subjects for cross-examination, not grounds for excluding Tregillis as an expert."[64]  But Plaintiffs own citation to the Supreme Court's decision in *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) makes AMI's point—variable selection is an issue for cross-examination and not grounds for exclusion **only if** the regression analysis "accounts for the major factors" affecting price.  *Id.*  Tregillis' Hedonic Regression Analysis does not.

Decisions subsequent to *Bazemore* have made clear that "it is the proponent [of a regression] who must establish that the major factors have been accounted for in the regression analysis." *Freeland v. AT & T,* 238 F.R.D. 130, 146 (S.D. N.Y. 2006).  Courts routinely exclude regressions that do not account for the major factors affecting price. *Id.*[65]  Here, Plaintiffs cannot

---

[61] Tregillis Depo. at 160.
[62] Tregillis Declaration, ¶ 17.
[63] Tregillis Depo. at 200.
[64] Plaintiffs' Response, p. 24
[65] *Kyle Cannot v. BP Products, Inc.,* 2013 WL 5514284, *10 (S.D. Tex. 2013) (excluding hedonic regression analysis for failure to account for all major factors); *The IAMS Co. v. Nutro*

meet their burden of establishing that the Hedonic Regression Analysis accounts for the major factors affecting price; Tregillis' analysis assumes that that the <u>only</u> factors that contribute to price differentials are the phrases from the package labels which he personally deemed to be marketing phrases, rather than other product attributes such as the <u>brand</u> of the product.

In his Declaration, Tregillis argues that—although admittedly he did not include a brand attribute[66]—he did in a way control for brand by including Obrigado brand coconut water in his final regression. But for the inclusion of Obrigado, <u>all</u> of the "Brazilian sales" in the Hedonic Regression Analysis (*i.e*, the sales involving an alleged claim of Brazilian origin) are from the Vita Coco brand such that, of course, the Hedonic Regression Analysis necessarily conflates the claimed effect of an alleged Brazilian origin claim with the effect of the Vita Coco brand. **<u>Tregillis admits this is the case</u>** ("if I had used . . . the regression version without Obrigado, then AMI's criticism would be valid."[67]).

As his own analysis shows, however, Tregillis is wrong that the inclusion of sales from Obrigado magically solves his collinearity problem and isolates the Vita Coco brand premium from the purported premium of an alleged Brazilian origin claim. First, Tregillis *himself* stated that sales from brands "that had sales of less than 1% of Vita Coco's sales volume [less than 2 million ounces] would be inapposite" and thus he did not include them in his regression.[68] Even

---

*Prods., Inc.*, 2004 WL 5496244, *5-*6 (S.D. Ohio 2004)("*Bazemore* supports the distinction between considering all measurable variables, which is not required..., <u>and omitting major potentially explanatory variables, which renders the analysis invalid</u> . . . <u>Case law supports . . . declaring regression analysis inadmissible when it omits one or more major variables</u>.")((citing *Bickerstaff v. Vassar College,* 196 F.3d 435, 449-450 (2d Cir. 1999), *Bullington v. United Air,* 186 F.3d 1301, 1313 n.8 (10th Cir. 1999), *People Who Care v. Rockford Bd. Of Edn.,* 111 F.3d 528, 537-38 (7th Cir. 1997)); *Winn-Dixie Stores, Inc. v. Dolgencorp,* 862 F. Supp.2d 1322, 1329-1333 (S.D. Fla. 2012)(excluding regression that failed to include variables necessary to isolate alleged damages).

[66] Contrary to Tregillis' description, the newly disclosed article in his Declaration (which addresses price index values not price premiums in a consumer class action), did <u>not</u> conclude that brand dummy variables should not be used. In fact, it explicitly rejected that conclusion, stating "we feel that brand dummies are still capturing unobserved quality that should be accounted for." Ruder & To, "Brand Dummy Variables in Hedonic Regressions: A Study Using Stereo Receiver Scanner Data," U.S. Bureau of Labor Statistics, April 2004, p.10.

[67] Tregillis Declaration, ¶31.

[68] Tregillis Report, p. 38.

though Obrigado clearly had annual sales of less than 2 million ounces, however, Tregillis broke his own rule and included these "inapposite" Obrigado sales in his final regression.

Moreover, the suggestion that the inclusion of only one additional data point (i.e, the Obrigado brand in 2017) somehow isolates the impact of the Vita Coco brand from the impact of an alleged Brazilian origin claim is ridiculous. As explained by Dr. Ugone, even with the addition of Obrigado, the Vita Coco brand accounts for 99.8% of the underlying "Brazilian" sales in Tregillis' Hedonic Regression Analysis, whether measured by dollar sales or unit sales.[69] Thus, it is easy to understand that the inclusion of Obrigado does not meaningfully alleviate the collinearity problem between the alleged Brazilian origin variable and the Vita Coco brand.[70]

Indeed, when AMI's expert, Dr. Ugone, included additional variables in Tregillis' Hedonic Regression to account for brand, not only did this eliminate the statistical significance of a Brazilian origin claim, the regressions actually revealed that the "estimated effect of the Brazilian origin claim is negative and statistically significant."[71] While Tregillis purportedly disagrees with Dr. Ugone's regressions accounting for brand (relying on fundamental mischaracterizations of Ugone's work), and argues that variables for brand (and taste and quality) would not work within the construct of his Hedonic Regression Analysis, this does not mean that it is acceptable for Tregillis to ignore major factors that affect price. Rather, accepting as true the "impossibility" of accounting for these factors in Tregillis' Hedonic Regression Analysis, this simply underscores again that the Hedonic Regression Analysis must be excluded.[72]

Respectfully submitted,

/s/ *Raquel Fernandez*
**MELISSA C. PALLETT-VASQUEZ**
Florida Bar No. 715816
mpallett@bilzin.com
**LORI P. LUSTRIN**
Florida Bar No. 59228
llustrin@bilzin.com
**RAQUEL M. FERNANDEZ**

---

[69] Ugone Rebuttal, p. 25.
[70] Ugone Rebuttal, pp. 25-26.
[71] Ugone Rebuttal, pp. 26-29.
[72] *See Freeland,* 238 F.R.D. at 146 and case law cited *supra,* note 65.

Florida Bar No. 55069
rfernandez@bilzin.com
**JERRY GOLDSMITH**
Florida Bar No.  119525
jgoldsmith@bilzin.com
**BILZIN SUMBERG BAENA PRICE**
**& AXELROD LLP**
1450 Brickell Ave, Suite 2300
Miami, Florida 33131
Tel.: (305) 374-7580  Fax: (305) 374-7593

and

SCOTT VOELZ (admitted pro hac vice)
svoelz@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor,
Los Angeles, CA 90071
Tel: (213) 430-6680 Fax: (213) 430-6407
HANNAH Y. CHANOINE (admitted pro hac vice)
hchanoine@omm.com
O'MELVENY & MYERS LLP
Times Square Tower, 7 Times Square,
New York, NY 10036
Tel: (212) 326-2128 Fax: (212) 326-2061

*Attorneys for Defendant All Market Inc.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 24, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ *Raquel Fernandez*
Raquel Fernandez

MIAMI 5947957.4 82307/48378
7/24/2018